**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

AILERON INVESTMENT
MANAGEMENT, LLC, a Florida
limited liability company,

        Plaintiff,                      Case No.:  8:21-cv-00146-MSS-AAS

vs.

AMERICAN LENDING CENTER,
LLC, a California limited liability
company,

        Defendant.             /

**AMENDED COMPLAINT**

Plaintiff, Aileron Investment Management, LLC ("AIM") sues American

Lending Center, LLC ("ALC") and alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1.     AIM is a Florida limited liability company that is a wholly owned

subsidiary of Aileron Holdings, LLC.

2.     AIM's principal place of business is in Tampa, Hillsborough County,

Florida.

3.     AIM acts as a non-banking lending and investment firm specializing

in government-aided economic development programs, including the United

States Citizenship and Immigration Services EB-5 program.

4.      As part of its business operations, at all relevant times Aileron has acted as a lender, loan originator, loan servicing company, or loan broker.

5.      ALC is a California limited liability company that conducts business in Florida.

6.      ALC's business focuses on EB-5 lending opportunities.

7.      ALC and AIM partnered to develop a loan product that utilizes construction job creation to utilize EB-5 funding.  AIM functioned as the exclusive fund manager for ALC's EB-5 investors.

8.      ALC grew to become AIM's largest business partner by both funding and purchasing various loans originated by AIM and utilizing AIM to service those loans.

9.      Pursuant to its business relationship with ALC, AIM earned several different kinds of fees, including an origination fee on each loan that it originated for ALC, fees for construction management services, and fees for servicing the loans.

10.     ALC is subject to personal jurisdiction in the State of Florida because the cause of action accrued in Florida.  The funds misappropriated as described below occurred primarily in Florida and a significant number of the development projects that are the subject of claims as described below are located in Florida.

11.     Further, ALC operates, conducts, engages in, or carries on substantial and not isolated business activity within Florida. Without limitation, ALC has funded multiple significant development projects in Florida and its representatives have had significant contacts and communications with AIM representatives in Florida and traveled to Florida on multiple occasions to meet with AIM representatives and to conduct business in Florida.

12.     ALC's website identifies the following Florida projects completed by ALC: No. 76 Towneplace Suites, Marriott, FL, No. 68, Uptown at Liberty Park, FL, No. 65 Staybridge Suites, FL, No. 62 Hyatt Place, FL, No. 60 Feather Sound Hotel, FL, No. 59, Fairfield Inn and Suites, FL, No. 56 Hotel Indigo, FL, No. 33, Residence Inn by Marriott, FL, No. 30 Staybridge Suites Orlando-Seaworld, FL, and No. 19 Southern Oaks Assisted Living Facility, Fl. ALC's website states that it has "regional center coverage across 19 U.S. states — including California, Florida…"

13.     ALC's website includes press releases regarding Florida projects including the following:

   a. **NAPLES, FL** (March 16, 2020) "TownePlace Suites by Marriott in Naples is now open! ALC provided $2.5 million in EB-5 funds toward the development of the Florida Hotel… ALC's rigorous construction management system led by highly successful third parties, in coordination with the senior loan operation, has driven the consistent

3

success of investments like these. The TownePlace Suites joins a number of other successfully developed and opened ALC projects in Florida including the recently opened Uptown at Liberty Park in Cape Coral."

b. **DAVIE, FL** (February 10, 2020) – "Local government, community and industry leaders gathered Wednesday, January 22, to welcome the new Staybridge Suites to the community of local businesses. The property is poised to make a significant positive impact on the local economy.  The hotel hosted the Town of Davie Mayor as well as representatives from community leadership, the regional chamber of commerce and key investor American Lending Center (ALC) to showcase the property and celebrate the influx of energy into the community."

c. **CAPE CORAL, FL** (December 10, 2019) – "American Lending Center (ALC), a leading EB-5 regional center, recently celebrated the opening of Atrium at Liberty Park, an assisted living community in Cape Coral. While they officially opened in November, prospective residents are encouraged to tour the campus and meet the staff on December 12th at their Holiday Open House.  As an investor in the project, Atrium remains ALC's largest investment thus far. The home has already generated considerable interest with 54 reservations and many residents beginning to move in. Showcasing supportive independent and assisted living as

well as memory care options, it also promises residents an active lifestyle, featuring over 110,000 square feet of landscaped courtyards, amenity spaces and 130 residences."

14.     Since 2014, ALC and its management also have operated a Florida entity, American Lending Center Florida, LLC.

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that: (a) this is an action between a citizen of a foreign state and a citizen of the State of Florida; and (b) the amount in controversy herein exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees.

16.     The sole member of AIM is Aileron Holdings, LLC which is a Florida limited liability company with its principal place of business in Hillsborough County, Florida.  Aileron Holdings, LLC's members are B&B Capital Ventures, Inc., a Florida corporation with its principal place of business in Hillsborough County, Florida and Avalon Partners, LLC, a Florida limited liability company with its principal please of business in Pinellas County, Florida.  The members of Avalon Partners, LLC, Steve Anderson, Anne Anderson, Camille Anderson and Brielle Anderson, are residents of Florida.

17.     Upon information and belief, none of the members of ALC are Florida citizens and none have their principal place of business in Florida.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## ALC HIRES AIM'S MANAGING DIRECTORS AND LEGAL COUNSEL

19.     From 2010 to 2018, Joseph R. Bonora ("Bonora") was employed by AIM and served as its managing director.

20.     From September 2010 to September 2017, Michael Maguire ("Maguire") was employed by AIM and served as its co-managing director.

21.     As AIM's managing directors, Bonora and Maguire owed AIM fiduciary duties of loyalty and care which required both individuals to, among other things, act in good faith with respect to AIM's business dealings, and to refrain from self-dealing.

22.     Beginning in or around 2010 Justin Blackhall and his law firm Blackhall, P.C. (collectively, "Blackhall") began representing AIM and its affiliates and predecessors as legal counsel. In that capacity, Blackhall regularly provided AIM and its affiliates legal counsel and other legal services, including advice and counsel involving AIM's business relationship with ALC such as structuring, drafting and reviewing legal documents on transactions and loans originated by AIM.  For example, Blackhall prepared and reviewed transaction documents on most, if not all, of the loans that AIM originated.  Blackhall, among others, described his role to third parties as AIM's "general counsel."

23.     As AIM's legal counsel, Blackhall owed AIM fiduciary duties of loyalty and care which required Blackhall to avoid conflict of interest transactions,

6

to act in the best interests of AIM and to refrain from self-dealing to the detriment of AIM.

24. At all relevant times, ALC was aware of Bonora, Maguire and Blackhall's respective positions and relationships with AIM, as well as their fiduciary duties owed to AIM.

25. Notwithstanding, during the time that Blackhall represented AIM as its legal counsel, Blackhall, without AIM's knowledge or consent, worked for ALC in an executive level position as Vice President and Finance Counsel.

26. In addition, during the time that Maguire and Bonora were employed by AIM, both Maguire and Bonora, without AIM's knowledge or consent, held executive level positions at ALC as Directors of Capital Markets.

27. ALC's hiring of Maguire, Bonora and Blackhall (collectively, the "Former AIM Representatives") created conflict of interests leading to a number of transactions that ALC knew breached the fiduciary duties that each individual owed to AIM.

## FORMATION OF SILVER HAWK LOAN SERVICES, LLC
## AND MISAPPROPRIATION OF AIM'S LOAN PREMIUMS AND FEES

28.     On or about June 23, 2014, the Former AIM Representatives formed Silver Hawk Loan Services, LLC ("Silver Hawk"), a shell company[1] that was used to divert millions of dollars in fees that should have been paid by ALC to AIM.

29.     Starting in 2014, ALC began paying significant origination, construction management and loan servicing fees (together, the "Fees") to Silver Hawk for loans that were originated, managed and serviced for ALC by AIM.  In spite of the millions paid by ALC to Silver Hawk, Silver Hawk did not provide, any actual services to ALC.

30.     ALC, was aware that AIM was entitled to receive the Fees for the origination, construction management and servicing related to the ALC loans.

31.     ALC assisted and facilitated Silver Hawk's misconduct by paying millions of dollars in Fees to Silver Hawk that should have been paid to AIM.  ALC continued paying Silver Hawk significant Fees after ALC became aware that AIM had initiated legal action against the Former AIM Representatives and Silver Hawk and asserted that the Fees were being misappropriated.

---

[1] At all relevant times, Silver Hawk did not have a phone number, email domain, physical office or any employees.

32.     The Former AIM Representatives conduct in diverting the Fees to Silver Hawk constituted a breach of the fiduciary duties that those individuals owed to AIM.

33.     In addition, ALC assisted with and facilitated the unauthorized assignment of certain loan premiums that were due and owing to AIM from Live Oak Banking Company ("Live Oak Bank").

34.     Specifically, AIM and Live Oak Bank had a business relationship known to ALC whereby AIM sold to Live Oak Bank first mortgage loans on ongoing commercial construction projects in exchange for significant loan premiums.

35.     On or about March 30, 2018, ALC and Maguire (who had separated from AIM approximately six months earlier) signed an omnibus assignment purportedly as an authorized signatory of AIM which was designed to assign to ALC multiple loan premiums worth more than a million dollars (the "Loan Premiums") that were due to AIM from Live Oak Bank (the "Omnibus Assignment to ALC"). A true and correct copy of the Omnibus Assignment to ALC is attached as Exhibit A.

36.     AIM did not receive any consideration in connection with the Omnibus Assignment to ALC.

37.     Simultaneously, on or about March 30, 2018, ALC and Silver Hawk executed a separate omnibus assignment which purported to assign the same Loan Premiums to Silver Hawk (the "Omnibus Assignment to Silver Hawk"). A true and correct copy of the Omnibus Assignment to Silver Hawk is attached as Exhibit B.

38.     Blackhall, who was working for ALC at the time, prepared both the Omnibus Assignment to ALC and the Omnibus Assignment to Silver Hawk.

39.     Maguire signed the Omnibus Assignments purportedly on behalf of AIM to ALC even though he had not been employed by AIM for approximately six months and had a continuing role as ALC's Director of Capital Markets. Maguire also had an exclusive Origination and Servicing Agreement with ALC through an affiliated entity he formed, whereby AIM's loan business was transferred to Maguire. ALC executed both the Omnibus Assignment to ALC, purporting to transfer the Loan Premiums to ALC, and the Omnibus Assignment to Silver Hawk, purporting to transfer the Loan Premiums from ALC to Silver Hawk.

40.     ALC, directly and through its agents Maguire and Blackhall (who held positions with ALC), knew that AIM was entitled to receive the Loan Premiums that were assigned to ALC and that ALC subsequently assigned to Silver Hawk.

41.     ALC knowingly facilitated and assisted Silver Hawk's misappropriation of the Loan Premiums due to AIM by executing the Omnibus Assignments.

42.     The Former AIM Representatives conduct in misappropriating the Loan Premiums due to AIM constitutes a breach of the fiduciary duties that each individual owed to AIM.

43.     In addition, Maguire directed Live Oak Bank to pay to ALC the Beaufort Hospitality premium of $288,000 owed to AIM (the "Beaufort Premium").

44.     All conditions precedent to the maintenance of this action have either occurred or been waived.

## COUNT I
## AIDING AND ABETTING MAGUIRE'S BREACH OF FIDUCIARY DUTY

45.     AIM realleges the allegations contained paragraphs 1 through 44 as if fully set forth herein.

46.     ALC knew that Maguire, as AIM's co-managing director, owed fiduciary duties of loyalty and care to AIM which required Maguire to act in AIM's best interest and to refrain from self-dealing.

47.     Maguire breached his fiduciary duties to AIM by his participation in the diversion of the Fees to Silver Hawk.

48.    ALC, through its agents, the Former AIM Representatives, and directly, knew that diverting payment of the Fees to Silver Hawk constitutes a breach of Maguire's fiduciary duties owed to AIM.

49.    Nevertheless, ALC substantially assisted in Maguire's breach of his fiduciary duties by diverting to Silver Hawk payment of the Fees that should have been received by AIM.

50.    Maguire's breaches of fiduciary duties which ALC aided and abetted caused AIM substantial damages.

WHEREFORE, AIM respectfully requests a judgment against ALC for compensatory damages and punitive damages together with the costs incurred by AIM in this action, prejudgment and post-judgment interest and any other relief the Court deems just and appropriate.

## COUNT II
## AIDING AND ABETTING BONORA'S BREACH OF FIDUCIARY DUTY

51.    AIM realleges the allegations contained paragraphs 1 through 44 as if fully set forth herein.

52.    ALC knew that Bonora, as AIM's co-managing director, owed fiduciary duties of loyalty and care to AIM which required Bonora to act in AIM's best interest and to refrain from self-dealing.

53.    Bonora breached his fiduciary duties to AIM by his participation in the diversion of the Fees and Loan Premiums to Silver Hawk.

54.     ALC, through its agents the Former AIM Representatives and directly, knew that diverting payment of the Fees and Loan Premiums to Silver Hawk would constitute a breach of Bonora's fiduciary duties owed to AIM.

55.     Nevertheless, ALC substantially assisted in Bonora's breach of his fiduciary duties by diverting payment of the Fees to Silver Hawk and by executing the Omnibus Assignment of the Loan Premiums to Silver Hawk.

56.     Bonora's breaches of fiduciary duties which ALC aided and abetted caused AIM substantial damages.

WHEREFORE, AIM respectfully requests a judgment against ALC for compensatory damages and punitive damages together with the costs incurred by AIM in this action, prejudgment and post-judgment interest and any other relief the Court deems just and appropriate.

## COUNT III
## AIDING AND ABETTING BLACKHALL'S BEACH OF FIDUCIARY DUTY

57.     AIM realleges the allegations contained paragraphs 1 through 44 as if fully set forth herein.

58.     ALC, through its agents, the Former AIM Representatives, and otherwise, knew that Blackhall, as AIM's legal counsel, owed AIM fiduciary duties of loyalty and care which required Blackhall to avoid conflict of interest transactions, to act in the best interests of AIM and to refrain from self-dealing to the detriment of AIM.

59.    Blackhall breached his fiduciary duties to AIM by his participation in

the diversion of the Loan Servicing Fees and Loan Premiums to Silver Hawk.

60.    In addition, Blackhall breached his fiduciary duties by preparing the

Omnibus Assignments which unlawfully assigned the Loan Premiums due AIM

to ALC and then from ALC to Silver Hawk.

61.    ALC knew that diverting payments of the Fees and Loan Premiums

to Silver Hawk constituted a breach of Blackhall's fiduciary duties owed to AIM

as AIM's legal counsel.

62.    ALC substantially assisted in Blackhall's breach of his fiduciary duties

by diverting payment of the Fees to Silver Hawk and by executing the Omnibus

Assignment of the Loan Premiums due to AIM to Silver Hawk.

63.    Blackhall's breaches of fiduciary duties which ALC aided and abetted

cased AIM substantial damages.

WHEREFORE, AIM respectfully requests a judgment against ALC for

compensatory damages and punitive damages together with the costs incurred by

AIM in this action, prejudgment and post-judgment interest and any other relief

the Court deems just and appropriate.

## COUNT IV
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

64.    AIM realleges the allegations contained paragraphs 1 through 44 as if

fully set forth herein.

65.    ALC was aware that AIM had a business relationship with Live Oak

Bank whereby AIM would be paid Loan Premiums on the loans that AIM sold to

Live Oak Bank.

66.    ALC intentionally and unjustifiably interfered with AIM's business

relationship with Live Oak Bank by improperly facilitating the assignment of Loan

Premiums that were due AIM first to ALC and then immediately to Silver Hawk

with no legitimate justification whatsoever and with no consideration to AIM.

67.    AIM has been damaged by ALC's intentional and unjustified

interference with AIM's business relationship with Live Oak Bank, including,

without limitation, special damages consisting of attorneys' fees and costs, that

AIM incurred by having to, among other things, litigate against Live Oak Bank[2] as

well as the lost use of the Loan Premiums between the time the Loan Premiums

were owed and the resolution of AIM's dispute with Live Oak Bank in May 2021.

68.    AIM resolved its dispute with Live Oak Bank in May 2021 and is not

seeking to recover from ALC the amount of the Loan Premiums except with

respect to the Beaufort Premium of $288,000 which was retained by ALC.

WHEREFORE, AIM respectfully requests a judgment against ALC for

compensatory damages, punitive damages, and special damages, including the

---

[2] *See Aileron Investment Management, LLC v. Live Oak Banking Company, d/b/a Live Oak Bank,* Case No. 8:21-cv-00108-VMC-CPT in the United States Middle District of Florida, Tampa Division.

costs, expenses and reasonable attorneys' fees incurred by AIM in having to

litigate against Live Oak Bank due to ALC's wrongful actions and the loss of use

of the Loan Premiums, together with the costs incurred by AIM in this action,

prejudgment and post-judgment interest and any other relief the Court deems just

and appropriate.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**

69.     AIM incorporates the allegations made in paragraphs 1 through 44 as

if fully set forth herein.

70.     ALC owed AIM fiduciary duties by virtue of their business

relationship and joint venture activities whereby ALC accepted a relationship of

trust and confidence. Without limitation, ALC and AIM partnered to utilize a

unique loan product that combined EB-5 and SBA-504 funding.  AIM located

borrowers for the benefit of itself and ALC and serviced loans funded by ALC.

Further, ALC funded certain portions of AIM's Florida development projects.

71.     As described above, ALC breached its fiduciary duty with respect to

the payment of servicing and origination fees to Silver Hawk that should have

been paid to AIM, by executing the Omnibus Assignments and by accepting the

Beaufort Premium owed to AIM.

72.     AIM has been damaged by ALC's breach of its fiduciary duties as

described above. Without limitation, ALC paid millions in servicing and

origination fees to Silver Hawk for services performed by AIM, caused AIM to lose

the use of its Loan Premiums for an extended time period prior to AIM's resolution

of its dispute with Live Oak Bank and accepted the Beaufort Premium of $288,000.

WHEREFORE, AIM respectfully requests a judgment against ALC for

compensatory damages, punitive damages, and special damages, including the

loss of use of the Loan Premiums together with the costs incurred by AIM in this

action, prejudgment and post-judgment interest and any other relief the Court

deems just and appropriate.

## DEMAND FOR JURY TRIAL

AIM requests a trial by jury on all issues so triable.

Dated: August ____, 2021

/s/ Robert L. Rocke
Robert L. Rocke, Esq. (FBN 710342)
Email: rrocke@rmslegal.com
Secondary: mlamoureaux@rmslegal.com
Jonathan B. Sbar, Esq. (FBN 131016)
Email: jsbar@rmslegal.com
Secondary: mlamoureaux@rmslegal.com
Andrea K. Holder, Esq. (FBN 104756)
Email: aholder@rmslegal.com
Secondary: lknox@rmslegal.com
ROCKE, MCLEAN & SBAR, PA
2309 S. MacDill Ave.
Tampa, FL 33629
Ph: (813) 769-5600
Fax: (813) 769-5601
Attorneys for AIM

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

filed and furnished to counsel of record via CM/ECF on August \_\_\_, 2021.

/s/ Robert L. Rocke
Attorney